**AMERICAN CIVIL LIBERTIES UNION, et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Defendant.**

**No. CIV.A. 03–2522(ESH).**

United States District Court, District of Columbia.

May 10, 2004.

Jameel Jaffer, Ann Beeson, American Civil Liberties Union, New York, NY, Arthur B. Spitzer, American Civil Liberties Union, Washington, DC, David L. Sobel, Electronic Privacy Information Center, Washington, DC, for Plaintiffs.

Raphael O. Gomez, Elizabeth J. Shapiro, U.S. Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM OPINION

HUVELLE, District Judge.

This lawsuit represents plaintiffs' second attempt to obtain information under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), regarding the Department of Justice's (DOJ) use of the USA Patriot Act.[1] Plaintiffs' first request concerned the number of times DOJ had used various surveillance and investigatory tools authorized by the Patriot Act, which gives federal officials greater authority to conduct surveillance within the United States to monitor the activity of foreign intelligence agents. In that case, the Court granted summary judgment to the government, upholding the government's withholding under Exemption 1 of FOIA. *See ACLU v. DOJ*, 265 F.Supp.2d 20, 34 (D.D.C.2003) ("*ACLU I* ").

The section of the Patriot Act at issue here is section 215, which was also one of the provisions at issue in *ACLU I*. As explained in that case, section 215 substantially expands the powers of the FBI under the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. § 1801 *et seq.* ("FISA"), to "make an application for an order requiring the production of any tangible things (including books, records, papers, documents, and other items) for an investigation to obtain foreign intelligence information . . . or to protect against international terrorism or clandestine intelligence activities . . . ." Patriot Act § 215,

*codified at* 50 U.S.C. § 1861(a)(1). Before the amendment, the FBI could compel only the disclosure of certain business records (rather than "any tangible things") in the possession a "common carrier, public accommodation facility, physical storage facility, or vehicle rental facility," and could only exercise its authority when it had "specific and articulable facts giving reason to believe that the person to whom the records pertain is a foreign power or an agent of a foreign power." Pub.L. No. 105–272, 112 Stat. 2396 § 602 (Oct. 20, 1998). Now, the FBI need only specify in a FISA request that the "records concerned are sought for an authorized investigation" consistent with the purposes of section 215. 50 U.S.C. § 1861(b)(2).

Since its implementation, the government has provided limited information to the public regarding its use of section 215. The provision itself contains a subsection prohibiting anyone served with a section 215 order from disclosing that the FBI sought or obtained information under the provision. *Id.* § 1861(d). And, although the total number of secret surveillance warrants sought and issued under the Patriot Act is required to be disclosed annually,[2] the number of applications submitted and approved under each provision is only shared with designated congressional oversight committees—in classified form. *See, e.g.,* 50 U.S.C. § 1862 (providing for biannual reporting to the committees on the judiciary of the "total number of applica-

---

1. The Patriot Act is officially titled the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001," Pub.L. No. 107–56, 115 Stat. 272 (Oct. 26, 2001). Section 215 of the Act is codified at 50 U.S.C. § 1861. Plaintiffs include the American Civil Liberties Union (ACLU), the Electronic Privacy Information Center (EPIC), the American Booksellers Foundation for Free Expression (ABFFE), and the Freedom to Read Foundation (FTRF).

2. This disclosure is provided in April of each year pursuant to 50 U.S.C. § 1807. Although this provision only requires disclosure regarding "electronic surveillance," the Attorney General has reported numbers related to applications made both for "electronic surveillance and physical search." *See* Report from John Ashcroft to L. Ralph Mecham, Director, Administrative Office of the United States Courts (April 29, 2003).

tions made for orders approving requests for the production of tangible things" under section 215 and "total number of such orders either granted, modified, or denied").

After the Court issued its opinion in *ACLU I*, the Attorney General, in order to address the "troubling amount of public distortion and misinformation in connection with Section 215," issued a memorandum declassifying "the number of times to date that the Department of Justice, including the Federal Bureau of Investigation (FBI), has utilized Section 215 of the USA PATRIOT Act relating to the production of business records. The number of times Section 215 has been used to date is zero (0)." (Pls.' Cross-mot. Ex. A, Attach. 3 [Mem. for FBI Director Robert S. Mueller from the Attorney General].) In other words, the declassified statistic "represents the number of times a Section 215 FISA application has been approved by the FISA court and then implemented by the FBI." (Supp. Hardy Decl. ¶ 5.)

The Attorney General's declassification decision prompted plaintiffs to renew their prior request, but this time focusing only on section 215. Currently, plaintiffs seek two categories of information pertaining to that provision. First, they have requested "the total number of Section 215 requests received by the FBI's National Security Law Unit" (at FBI headquarters) from FBI field offices between October 26, 2001 and February 7, 2003,[3] and second, they seek "any and all records relating to Section 215 of the Patriot Act" on an expedited schedule. (Hardy Decl. Ex. B. [Pls.'

Oct. 23, 2003 FOIA request to FBI] at 2.) The government maintains that the Attorney General's declassification decision has no bearing on its continued Exemption 1 withholding of the statistic representing the number of times that FBI field offices have submitted section 215 applications to FBI headquarters, and contends that expedited processing of plaintiffs' request for all section 215 records is not warranted. Both parties have moved for partial summary judgment on these issues. For the reasons given below, the Court concludes that plaintiffs are entitled to expedited processing of their request, but that the Attorney General's declassification decision does not alter the Court's conclusion that the requested information is properly withheld under Exemption 1.

## ANALYSIS

### I. EXPEDITED PROCESSING

Plaintiffs have requested expedited processing of their request for "all records relating to Section 215." FOIA provides for expedited processing of requests for agency records, directing agencies to "process as soon as practicable any request for records to which [they have] granted expedited processing." 5 U.S.C. § 552(a)(6)(E)(iii). Expedition is available for requests "(I) in cases in which the person requesting the records demonstrates a compelling need; and (II) in other cases determined by the agency." *Id.* § 552(a)(6)(E)(i). Plaintiffs invoke two possible avenues for expedited processing. First, "with respect to a request made by a

---

**3.** In their October 23, 2003 request, plaintiffs sought an unredacted copy of a document dated February 7, 2003 entitled "Business Record Order Requests Since 10/26/2001" (the "Section 215 List"), that the government had released in heavily-redacted form in response to plaintiffs' first (*ACLU I*) FOIA request. (*See* Hardy Decl. Ex. B. [Pls.' Oct. 23,

2003 FOIA request to FBI] at 1–2.) Plaintiffs, however, have withdrawn that request "except insofar as the redacted information indicates the total number of Section 215 requests received by the FBI's National Security Law Unit during a particular time period." (Pls.' Cross-mot. at 7.)

person primarily engaged in disseminating information," a compelling need for expedition may be shown by demonstrating an "urgency to inform the public concerning actual or alleged Federal Government activity." *Id.* § 552(a)(6)(E)(v)(II); *see also* 28 C.F.R. § 16.5(d)(1)(ii). Second, pursuant to DOJ regulation, requests may be expedited if they involve a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv). Plaintiffs submitted a request based on the former standard to the FBI, and based on the latter to the Office of Public Affairs (OPA).[4] (*See* Hardy Decl. Ex. B.) Their requests were denied, and now both parties have moved for summary judgment with respect to plaintiffs' request for expedited processing.

## A. Compelling need under 28 C.F.R. § 16.5(d)(1)(ii)

■ As a preliminary matter, the government contends that plaintiffs' claim for expedited processing pursuant to 28 C.F.R. § 16.5(d)(1)(ii) should be dismissed because they did not appeal the decision refusing to expedite their request, thereby failing to exhaust the available administrative remedies before bringing suit. (*See* Def.'s Mot. at 19 (citing *Oglesby v. United States Dept. of the Army*, 920 F.2d 57, 65 (D.C.Cir.1990) ("foregoing an administrative appeal will preclude the requester from ever bringing suit on that request because the individual will not have exhausted his administrative remedies")).) FOIA, however, specifically authorizes judicial review for challenges to "[a]gency action to *deny or affirm denial* of a request for expedited processing pursuant to

this subparagraph …." 5 U.S.C. § 552(a)(6)(E)(iii) (emphasis added). This italicized language "clearly indicates that judicial review is appropriate at either of two moments: when the agency has denied a request for expedited processing, or when the agency has, upon administrative appeal, affirmed the denial of such a request." *Al–Fayed v. CIA*, No. 00–2092, 2000 U.S. Dist. LEXIS 21476, *7 (D.D.C. Sept. 20, 2000), *aff'd on other grounds*, 254 F.3d 300, 311 (D.C.Cir.2001) (holding that judicial review of agency's denial of expedited processing request is appropriate where plaintiff did not appeal the decision to the agency); *see also EPIC v. DOJ*, No. 03–2078, slip op. at 5 (D.D.C. Dec. 19, 2003) (same).

This express provision for judicial review defeats the government's attempts to discredit the holdings in *Al–Fayed* and *EPIC*. For example, contrary to the government's position, the fact that section 552(a)(6)(E)(ii)(II) requires agencies to enact regulations ensuring "expeditious consideration of administrative appeals" of expedited processing decisions does not make such an appeal a *prerequisite* for judicial review. See 5 U.S.C. § 552(a)(6)(E)(ii)(II). The administrative appeal requirement imposed upon claimants seeking review of fee waiver denials is likewise not relevant here, because FOIA does not expressly allow a requester to seek immediate judicial review of a fee waiver refusal. *See id.* § 552(a)(4)(vii). Furthermore, although DOJ has issued a regulation stating that an administrative appeal is generally required before seeking judicial review, *see* 28 C.F.R. § 16.9(c), those regulations do not preempt the express allowance of an election provided by the statute. *See EPIC*, No. 03–2078, at 5

---

4. OPA is responsible for deciding whether to grant expedited processing under 28 C.F.R. § 16.5(d)(1)(iv).

(quoting *Judicial Watch, Inc. v. Rossotti,* 326 F.3d 1309, 1313 (D.C.Cir.2003) (" 'No particular deference' is owed to an agency's interpretation of FOIA.")). Thus, although complete exhaustion of administrative remedies is often required (as in *Oglesby* ) before seeking the court's review of FOIA determinations, it is applied "because of specific provisions in FOIA that are inapplicable in the expedited processing context," *EPIC,* at 5–6, and therefore, plaintiffs' failure to appeal the FBI's refusal to expedite their request does not preclude judicial review of the decision.

■ Turning to the merits, the Court must decide whether plaintiffs have demonstrated an "urgency to inform" and hence a "compelling need" for the documents they seek. This determination hinges on three factors: (1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity. *See Al–Fayed,* 254 F.3d at 310. Review of the agency's decision that a request poses no "compelling need" is *de novo,* but the fac-

tors must be "narrowly applied," *see id.* at 310–11, and the Court is restricted to the record before the agency at the time it denied the request for expedited processing. *See* 5 U.S.C. § 552(a)(6)(E)(iii).

■ The government concedes that plaintiffs' request concerns federal government activity, but argues that there is no urgency to inform the public about it, nor any significant recognized interest at stake.[5] Section 215, however, unquestionably implicates important individual liberties and privacy concerns which are of immediate public interest in view of the ongoing debate regarding the renewal and/or amendment of the Patriot Act. Newspaper articles plaintiffs cited in their request for expedited processing discuss, for example, how widespread public concern is reflected by the many resolutions passed by local and state governments urging Congress to narrow provisions of the Patriot Act. *See, e.g.,* Dan Eggen, *Patriot Monitoring Claims Dismissed,* Washington Post, Sept. 19, 2003, at A2 ("More than 150 cities and three states have passed resolutions condemning the legislation as an attack on individual liber-

5. The FBI denied plaintiffs' request for expedited processing not only because it found "no particular urgency to inform the public," but also because the "primary activity of the Electronic Privacy Information Center (EPIC) is not information dissemination" as required under 5 U.S.C. § 552(a)(6)(E)(v)(II) for expedited processing pursuant to 28 C.F.R. § 16.5(d)(1)(ii). (Hardy Decl. Ex. C [Oct. 30, 2003 Letter from David M. Hardy to ACLU] at 1.) In its opposition to plaintiffs' cross-motion, however, the government indicates that "[t]hrough administrative error, the FBI's letter identified EPIC instead of ACLU as the primary party seeking expedited processing as 'not primarily engaged in disseminating information.' " (Def.'s Opp. at 13 n. 3.) The government's position regarding the issue is left unclear, but it seems to have abandoned this ground for refusal to expedite the request. If it means only to concede that EPIC is primar-

ily engaged in the dissemination of information, this plaintiff's status is sufficient to allow expedited processing. *See Al–Fayed,* 254 F.3d at 309 (as long as one of the plaintiffs qualifies as an entity "primarily engaged in disseminating information," the requirement is satisfied). Even if the government did not intend to concede EPIC's status, the Court concludes that EPIC is indeed "primarily engaged in disseminating information" for the purposes of expediting the request. *Cf. EPIC v. Dep't of Defense,* 241 F.Supp.2d 5, 11 (D.D.C.2003) (finding that EPIC is a "representative of the news media" for FOIA fee waiver request purposes because it "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience") (internal citation and quotation omitted).

ties.""). Plaintiffs also cited an article discussing the Attorney General's August 2003 cross-country tour initiated to defend the Patriot Act against its numerous critics. *See* Editorial, *Ashcroft's Dragnet*, Boston Globe, Sept. 9, 2003, at A14 ("The invitation-only session [in Boston] is part of Ashcroft's 18–city tour to defend the Patriot Act against mounting claims that it undermines civil liberties."") [6]

Because the records that plaintiffs seek relate to current surveillance efforts, the potential invasion of the public's privacy interests is of immediate concern, weighing in favor of a finding of expediency. *See Al–Fayed*, 254 F.3d at 310 (finding expedited processing inappropriate where "[a]ll of the events and alleged events occurred two to three years before plaintiffs made their request for expedited processing" and thus "none of the events at issue is the subject of a currently unfolding story"). In fact, the Attorney General declassified the number of times the provision has been used in an attempt, as he acknowledged, to "counter the troubling amount of public distortion and misinformation in connection with Section 215." (Pls.' Cross-mot. Ex. A, Attach. 3 [Mem. for FBI Director Robert S. Mueller from the Attorney General].) By finding that declassification was "in the public inter-

est," and in the best interest of law enforcement since "[p]ublic confidence in law enforcement is of paramount importance" (*id.*), the Attorney General implicitly, if not explicitly, recognized that information relating to section 215 implicates a matter of current exigency.

Moreover, a principle aim of plaintiffs' FOIA request is to provide information for "the ongoing national debate about whether Congress should renew Section 215 and other Patriot Act surveillance provisions before they expire in December 2005." (Pls.' Cross-mot. at 16.) Plaintiffs contend that information about the way that the FBI has implemented and used the provision is required now to inform this debate, and that if plaintiffs' request is relegated to the ordinary processing queue, production of responsive information would not occur before June 2005. (*See* Hardy Decl. ¶ 31.) Pending legislative proposals to amend the Patriot Act, plaintiffs argue, also require disclosure of current practices under the Act.

The government takes a piecemeal approach to plaintiffs' "compelling need" showing. It parses language from *Al–Fayed*, arguing that "newsworthiness alone" does not make a matter one of "current exigency," *see* 254 F.3d at 310,[7]

---

6. The articles cited by plaintiffs in their request for expedited processing reflect not only the public concern regarding the Act but also address section 215 specifically. *See, e.g.,* Bernie Sanders, *Patriot Act Overreaches*, USA Today, Sept. 23, 2003, at 22A ("The legal standard for obtaining an order [under section 215] is so loose that the government is virtually certain to get whatever it wants, whenever it wants."); Editorial, *Ashcroft's Dragnet*, Boston Globe, Sept. 9, 2003, at A14 ("Of particular concern is section 215, which authorizes searches of private documents including financial, medical, and library records without a warrant, and prevents doctors, librarians and others from informing clients that the records have been requested."); Bob

Egelko & Maria Alicia Gaura, *Libraries Post Patriot Act Warnings*, San Francisco Chronicle, March 10, 2003, at A1 ("[I]n the last year, Section 215 has roused organizations of librarians and booksellers into a burst of political activity, and is being cited increasingly by critics as an example of the new law's intrusiveness.").

7. The government also complains that the cursory descriptions that plaintiffs provided of the articles they reference in their request are insufficient to demonstrate "current exigency." Although the descriptions do not provide a complete recitation of the contents of the articles, the Court is unwilling to deny expedited processing simply because plaintiffs

that the "public's right to know" is insufficient by itself to satisfy the statutory standard, *see id.*, and that sunset provisions or discussions of new legislation do not establish urgency, because otherwise every FOIA request related to pending legislation would be entitled to expedited processing.[8] While the government may well be correct that any one of plaintiffs' justifications standing alone is insufficient to demonstrate a "compelling need," the Court finds that, when considered together, the host of factors relied on by plaintiffs (*see* Pls.' Reply at 13) are more than sufficient to satisfy the requirements of 28 C.F.R. § 16.5(d)(1)(ii). The FBI, therefore, erroneously denied plaintiffs' request for expedited processing under this standard.

**B. Media interest under 28 C.F.R. § 16.5(d)(1)(iv)**

■ Alternatively, even if plaintiffs could not satisfy the criteria for expedited processing under the "compelling need" test, they do meet the agency promulgated media-related standard. Under this standard, plaintiffs need only demonstrate that the subject matter of their request involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv).[9] As this Court has recognized," [e]ver since it was proposed, the Patriot Act has engendered controversy and debate." *ACLU I*, 265 F.Supp.2d at 24. The government, however, argues that the newspaper articles cited by plaintiffs in their request for expedited processing do not suffice to demonstrate a significant amount of media interest in the issue or suggest an improper government act to the detriment of public confidence. But even focusing only on the record before the agency at the time of the determination, as one must, the Court finds the government's position fails to pass the reasonableness test. *See Al-Fayed*, 254 F.3d at 307 n. 7.[10]

The articles cited by plaintiffs in their request and discussed in Section I(A), *supra*, demonstrate that the manner and frequency of the government's use of section

---

did not provide a more exhaustive description (or full copies) of the publicly-accessible articles.

8. The government also argues that the Court should not consider the renewal and/or amendment of the Patriot Act in its evaluation of "current exigency" because plaintiffs did not specifically refer to these issues in their request for expedited processing. (*See* Def.'s Opp. at 17.) The articles plaintiffs address, however, discuss both reauthorization and amendment. *See, e.g.*, Frank Kramer, *Why the Patriot Act Worries Booksellers*, Boston Globe, Oct. 8, 2003, at A23 ("Section 215 is due to expire in 2005. However, despite the fact that it has never been used, the administration clearly wants to see it reauthorized."); Dan Eggen, *Patriot Monitoring Claims Dismissed*, Washington Post, Sept. 19, 2003, at A2 ("Ashcroft and the administration have reacted aggressively, vowing to thwart any attempts to limit the Patriot Act's reach. And

in an announcement last week, President Bush proposed expanding the powers granted by the law to investigate terrorism cases.")

9. As the government acknowledges, this Court previously held that this regulation was promulgated pursuant to DOJ's discretionary authority, and thus, a requester is not required to demonstrate a "compelling need" to qualify for expedited processing under it. *See Edmonds v. FBI*, 2002 U.S. Dist. LEXIS 26578, at *8–9 (D.D.C. Dec. 3, 2002).

10. The government does not argue that plaintiffs failed to exhaust administrative remedies for this expedited processing request, because plaintiffs did not receive a timely response to their request (*see* Pls.' Cross-mot. at 6; Def.'s Mot. at 18), and it assumes that plaintiffs have thus constructively exhausted available administrative remedies. (*See* Def.'s Mot. at 18 (citing *Oglesby*, 920 F.2d at 63–66).)

215 are matters of "widespread and exceptional media interest." Although plaintiffs presented only a handful of articles, they were published in a variety of publications, and repeatedly reference the ongoing national discussion about the Patriot Act and section 215.[11] Their request for expedited processing, moreover, incorporated by reference their earlier Patriot Act FOIA request that cited over a dozen additional news articles describing the controversy surrounding the Act. (*See* Hardy Decl. Ex. B. at 5 & Attach. 2.) As DOJ's "media specialists," *see* 63 Fed.Reg. at 29592, OPA cannot simply turn a blind eye to the flurry of media attention (of which plaintiffs' articles are a representative sample) the Act has generated, nor can it turn a deaf ear to the Attorney General's acknowledgment of the "troubling amount of public distortion and misinformation in connection with Section 215." (Pls.' Crossmot. Ex. A, Attach. 3.)

The articles plaintiffs cite also illustrate that the information they have requested implicates government integrity. For example, the San Francisco Chronicle article reports that concerns regarding section 215's potential unconstitutionality have spawned proposed legislation to repeal the provision, resolutions declaring "a present danger to constitutional rights and privacy rights," and declarations urging defiance of the law. *See* Bob Egelko & Maria Alicia Gaura, *Libraries Post Patriot Act Warnings,* San Francisco Chronicle, March 10, 2003, at A1. The article from the Washington Post reports that section 215 has been "a central focus of criticism from civil liberties groups, booksellers and librarians, and has perhaps been some lawmakers' most frequently cited example of potential government abuse." Dan Eggen,

*Patriot Monitoring Claims Dismissed,* Washington Post, Sept. 19, 2003, at A2. This article specifically discusses the fact that members of Congress have "continually charged that abuses were taking place" under section 215, "despite the lawmakers' access to classified reports that showed that the Patriot Act provision had never been used." *Id.* It cites Senator John Edwards, concerned about potential abuses of some parts of the statute, as he warns of turning over "our constitutional rights to John Ashcroft." *Id. See also* Editorial, *Ashcroft's Dragnet,* Boston Globe, Sept. 9, 2003, at A14 ("Ashcroft's defenders challenge skeptics to provide evidence that anyone's rights have been abused by the Patriot Act. But how could anyone tell?"); Frank Kramer, *Why the Patriot Act Worries Booksellers,* Boston Globe, Oct. 8, 2003, at A23 ("The secrecy that surrounds Patriot Act subpoenas makes court challenges virtually impossible ... [and gives us] no way of knowing whether the FBI is abusing its power.") The suggestions of possible violations of privacy rights presented by these articles are sufficient to raise serious questions about the government's integrity with respect to its use of section 215.

The conclusion that OPA's refusal to expedite the processing of plaintiffs' request under 28 C.F.R. § 16.5(d)(1)(iv) was unreasonable is further bolstered by the fact that approximately a year earlier the agency granted plaintiffs' request for expedited processing in conjunction with their earlier Patriot Act FOIA request based on this standard, acknowledging that the request "pertain[ed] to a matter of widespread and exceptional media interest in which there exists possible questions about the government's integrity which affect

---

11. Contrary to the government's contention, it is unworkable to measure the merit of a request for expedited processing under the "media interest" standard by solely counting the number of news articles that the request cites.

public confidence." (Pls.' Cross-mot. Ex. A, Attach. 2 [Sept. 3, 2002 Letter from Melanie Ann Pustay to ACLU].) Although that request was more extensive than the current one, both set forth a purpose to "further the public's understanding of the government's use of surveillance powers inside the United States" because of the "strong public interest" in the information sought. (Hardy Decl. Ex. B [Pls.' Oct. 23, 2003 FOIA request to FBI] at 4 & Attach. 2 [Pls.' Aug. 21, 2002 FOIA request to FBI] at 5.)[12]

Thus, both requests have sought to compel DOJ to be more forthcoming with respect to the implementation and use of section 215, relate to some of the same documents, and would necessarily involve a similar analysis under 28 C.F.R. § 16.5(d)(1)(iv). Yet, the government has offered absolutely no justification for reversal.[13]  Indeed, the record before the Court indicates that skepticism regarding government integrity with respect to the Patriot Act has not subsided since plaintiffs' first Patriot Act FOIA request. Therefore, the Court finds the government's decision to be unreasonable and orders expedited processing of plaintiffs' FOIA request.

## II.  EXEMPTION 1

The information that plaintiffs seek—the total number of times within a specified time frame that FBI field offices compiled FISA applications pursuant to Section 215 and sent them to FBI headquarters for further required approvals—was previously requested in *ACLU I*. It was part of the "Section 215 List," identified in the *Vaughn* description submitted in that case as a document that "identifies project numbers (Proj ID), which are numbers chronologically assigned to each FISA re-

---

12. The first request sought "[a]ll policy directives or guidance issued . . . regarding the use of authority granted by" certain provisions of the Act, including Section 215. (Hardy Decl. Ex. B, Attach. 2 at 2.) It also requested records containing aggregate statistical information revealing how often certain provisions had been used, including "[t]he number of times . . . that the DOJ and/or the FBI has sought orders under 50 U.S.C. § 1861 *et seq.*, as amended by Section 215 of the Act, directing the production of 'tangible things,'" specifically requesting a breakdown of section 215 orders directed to libraries, bookstores or newspapers as they related to "a specific book or other specifically identified content," "a named individual," "a named United States citizen," "a named permanent resident," and as they were sought "at least in part on the basis of activities protected by the First Amendment . . . ." (*Id.* at 3.) Additionally, the request sought any records prepared and collected by DOJ and the FBI in connection with the determination that certain information was classified, including the number of times DOJ had obtained tangible objects or business records under certain provisions, including section 215. (*Id.* at 1–2.)

13. Under the Administrative Procedures Act, by analogy, courts consider whether an agency's actions were arbitrary or capricious by "examining whether it has acted consistently with its previous applications of the governing regulations and whether the application of its general regulative doctrines to the specifics of this case has been reasonable." *DSE, Inc. v. United States*, 169 F.3d 21, 28 (D.C.Cir.1999). In that context, it is axiomatic that "an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C.Cir.1996); *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C.Cir.1996); *Nat'l Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1201 (D.C.Cir.1984) (an agency is bound by its conclusion in a prior instance unless it has provided a reasoned explanation for its departure); *Doubleday Broad. Co. v. FCC*, 655 F.2d 417, 423 (D.C.Cir.1981) (by "deciding a case one way today and a substantially similar case another way tomorrow," without a reasonable explanation, the commission has acted arbitrarily and capriciously).  This same logic can be applied here to support a finding of unreasonableness.

quest from the field offices to the National Security Law Unit (NSLU) at FBI Headquarters, the date the NSLU received each request and the *total number of requests received* since 10/26/2001." (Hardy Decl. ¶ 37) (emphasis added). In *ACLU I,* the Court held that Exemption 1 protected records—including the Section 215 List— that indicate the "total number of times the FBI has used particular surveillance and investigatory authorities during a specified time period," because the government had satisfactorily explained that these records that "indicate how DOJ has apportioned its counterespionage resources [and] that reveal the relative frequency with which particular surveillance tools have been deployed ... may undoubtedly prove useful to those who are the actual or potential target of such surveillance, and may thereby undermine the efficiency and effectiveness of such surveillance." *ACLU I,* 265 F.Supp.2d at 28–31. Because the Court already ruled that this information was properly withheld, the government argues that the doctrine of *res judicata* bars plaintiffs' claim with respect to the information, or alternatively, that the information should continue to be shielded by Exemption 1.

## A. Res judicata

■ The government contends that *res judicata* bars plaintiffs' request for the number of field office section 215 requests because that issue was litigated in *ACLU I.* While plaintiffs do not dispute the identity of the two requests, they argue that *res judicata* is inapplicable because a post-judgment event has given rise to a new claim.

It is clear that *res judicata* does not preclude claims based on facts not yet in existence at the time of the original action, *see Drake v. Fed. Aviation Admin.,* 291 F.3d 59, 66 (D.C.Cir.2002) (citing *Page v.*

*United States,* 729 F.2d 818, 820 & n. 12 (D.C.Cir.1984)); *see also Stanton v. Dist. of Columbia Court of Appeals,* 127 F.3d 72, 78 (D.C.Cir.1997) ("post-judgment events give rise to new claims, so that claim preclusion is no bar"), or when changed circumstances alter the legal issues involved. *Wolfe v. Froehlke,* 358 F.Supp. 1318, 1319 (D.D.C.1973), *aff'd,* 510 F.2d 654 (D.C.Cir.1974). As here, *Wolfe* involved a FOIA request for the same information unsuccessfully sought in a prior suit. *Id.* The Court held that since the justification for withholding the information had changed after the first suit, a challenge to continued non-disclosure under the newly proffered exemption was not barred by claim preclusion. *Id.* at 1319–20.

Here, plaintiffs argue that the Attorney General's declassification of the frequency with which section 215 has been deployed undermines the justification previously offered and accepted for withholding the "Section 215 List." Thus, rather than seeking to relitigate issues that were decided in *ACLU I,* plaintiffs present a new question—whether the statistic they seek is properly withheld in light of the Attorney General's declassification decision. The Attorney General's declassification occurred in September 2003—four months after the issuance of *ACLU I*—and, as in *Wolfe,* altered the legal issues bearing upon plaintiffs' FOIA request. *Res judicata,* therefore, cannot preclude plaintiffs' claim, for "[t]he doctrine does not bar a litigant from doing in the present what he had no opportunity to do in the past." *Drake,* 291 F.3d at 66.

## B. Exemption 1

■ While plaintiffs' claim for the information does not run afoul of *res judicata,* it still must overcome the formidable hurdle erected by Exemption 1, FOIA's na-

tional security exemption. The law relating to this exemption was set forth in this Court's prior opinion (*see ACLU I,* 265 F.Supp.2d at 27–28) and need not be repeated here. *See also Ctr. for Nat'l Security Studies v. DOJ,* 331 F.3d 918, 918 (D.C.Cir.2003); *Coldiron v. DOJ,* 310 F.Supp.2d 44, 46–47 (D.D.C.2004). In *ACLU I,* the government successfully argued that the "Section 215 List" falls within Executive Order 12,958 and was properly classified because it contains information related to "intelligence activities . . ., sources or methods" that, if disclosed, " 'reasonably could be expected to result in damage to national security.' " 265 F.Supp.2d at 28 (quoting Exec. Order No. 12,958 §§ 1.2, 1.5). There, the Court found that the government had satisfactorily explained that revealing information regarding the focus of the FBI's counterintelligence efforts could enable our adversaries to avoid or defeat such efforts, and in particular with respect to section 215, that "disclosing the number of FISA applications made for the production of tangible things could enable adversaries to discern whether and to what extent business records and other items in the possession of third parties offered a safe harbor from the FBI." *Id.* (citing Decl. of James A. Baker ¶ 17). Thus, the issue now before the Court is whether the Attorney General's September 2003 decision to declassify the number of section 215 applications granted by the FISA court means that the information that plaintiffs seek can no longer be withheld under Exemption 1.

While the resolution of this issue is hardly free from doubt, the Court will uphold the government's claim of exemption because it is mindful of the "long-recognized deference to the executive on national security issues," and the need to accord "substantial weight" to an agency's affidavit attesting to the classified status of documents implicating security issues. *Nat'l Security,* 331 F.3d at 927–28 (quoting *McGehee v. Casey,* 718 F.2d 1137, 1148 (D.C.Cir.1983)). Indeed, the Court of Appeals in this Circuit has cautioned that the "judiciary is in an extremely poor position to second-guess the executive's judgment in this area of national security," and has counseled deference to executive affidavits predicting harm to national security. *Id.* (citing *King v. DOJ,* 830 F.2d 210, 217 (D.C.Cir.1987)). Thus, although "deference is not equivalent to acquiescence," *Campbell v. DOJ,* 164 F.3d 20, 30 (D.C.Cir. 1998), it is the responsibility of the executive, not the courts, to "weigh the variety of subtle and complex factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the agency's intelligence-gathering process." *Nat'l Security,* 331 F.3d at 927 (quoting *CIA v. Sims,* 471 U.S. 159, 180, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985)); *see also Assassination Archives and Research Ctr. v. CIA,* 334 F.3d 55, 58 (D.C.Cir.2003).

Given this binding precedent, it is not a question of whether the Court agrees with the defendant's assessment of the danger, but rather, "whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility in this field of foreign intelligence in which the [agency] is expert and given by Congress a special role." *Gardels v. CIA,* 689 F.2d 1100, 1105 (D.C.Cir.1982). The declarations of David M. Hardy, the Section Chief of the FBI's Record/Information Dissemination Section, satisfy this standard.[14]

---

14. The government submitted an initial declaration by Mr. Hardy with its motion, and a supplemental declaration with its opposition to plaintiffs' cross-motion. Plaintiffs are correct in noting that the first declaration mimics the declaration offered by the FBI in *ACLU I,*

They describe how the release of the number of section 215 field office requests poses the continuing potential to "harm our national security by enabling our adversaries to conduct their intelligence or international terrorist activities more securely." (Supp. Hardy Decl. ¶ 7.) Specifically, Mr. Hardy states the release would disclose the frequency of use of this specific technique during a specific time period, could signal to targets of investigations that it is comparatively safe to conduct certain operations and activities based on the FBI's allocation and direction of resources, and as successfully submitted in *ACLU I*, it would enable our adversaries to discern whether or to what extent business records and other such "tangible things" in the hands of third parties were a safe harbor from the FBI. (*Id.* ¶ 8.)

In response, plaintiffs challenge the government's explanation by arguing that "[a]pplications submitted by FBI field offices have no bearing whatsoever on actual surveillance unless the applications are ultimately approved by FBI headquarters (and by the FISA court)." (Pls.' Reply at 6–7.) According to plaintiffs, since the number of section 215 requests actually approved and implemented is the only statistic of consequence for national security, any harm to national security that might result from the disclosure of the field office requests has already resulted from the declassification order. Thus, in plaintiffs' view, the only reason the number of field office requests in *ACLU I* was protected was because of its potential to reveal something about the actual implementation

of section 215, and given the Attorney General's declassification decision, adversaries have now been informed to what extent business records were a safe harbor from the FBI, and thus, the number of field office requests should not be protected.

In *ACLU I*, the Court confronted a similar claim by plaintiffs. There, they argued that since aggregate statistical information regarding the use of the Patriot Act had been disclosed (in that case pursuant to section 107 of FISA), there could be no further harm to national security from further disclosure of the number of times DOJ has used each particular surveillance and investigatory tool authorized by the Patriot Act. The Court rejected that argument and will also do so here, for as noted in *ACLU I*, the fact that the Attorney General has declassified some information relevant to section 215 does not "mean that different, but *arguably analogous,* information must thereby automatically be disclosed under FOIA. Instead, the question must turn . . . on whether the government has provided a specific and persuasive explanation of why such disclosures would be at odds with national security." *Id.* at 31.

Moreover, the Attorney General's decision to declassify certain statistics relating to the use of section 215 does not operate to estop the government from refusing to disclose different information relating to the proposed use by FBI field offices of this investigatory tool. *Nat'l Security*, 331 F.3d at 930–31 (rejecting plaintiffs' "discredited argument" that the disclosure of

---

and that this Court found that declaration to be inadequate. (*See* Pls.' Cross-mot. at 11–12 (citing *ACLU I*, 265 F.Supp.2d at 29) ("The analysis here has in no way been tailored to the particular surveillance tools about which plaintiffs seek information, and does not address the specific harm likely to flow from the [information's] release . . . .").) There, the

Court found a second declaration by the Office of Intelligence Policy and Review (OIPR) served to remedy the gaps in the FBI declaration (*see* 265 F.Supp.2d at 29), and similarly, in this case the Court finds that Mr. Hardy's supplemental declaration addresses the glaring deficiencies in his first declaration.

some of the detainees' names undermines the government's claim of national security). For, as explained by the Circuit Court, "'[i]t is the responsibility of the [executive] not that of the judiciary' to determine when to disclose information that may compromise intelligence sources and records." *Nat'l Security*, 331 F.3d at 931 (quoting *Sims*, 471 U.S. at 180, 105 S.Ct. 1881).

In this regard, the Court is satisfied that the government has carried its burden. As explained by the government, the number of section 215 field office requests deserves protection in its own right, not merely by virtue of what this number might reveal about section 215's actual implementation. "While a hostile intelligence service or international terrorist group now knows that for a certain time period, no Section 215 FISAs were issued, by disclosure of [the requested] information they would know the level of FBI activity ... seeking to use ... this particular Patriot Act technique." (Def.'s Opp. at 9.) Disclosure of the number of section 215 applications sought could also permit an adversary to "assess the exposure of business records to current or future operations" and to conclude that "it is comparatively safe to conduct certain operations and activities based on the FBI's allocation and direction of resources." (Hardy Supp. Decl. ¶ 8; Def.'s Opp. at 8.) Thus, by properly construing "use" more broadly than plaintiffs do to encompass proposed—as well as actual—use, the government has offered a reasonable explanation for the continued withholding of the statistic under Exemption 1.[15]

Moreover, despite plaintiffs' protestations to the contrary (*see* Pls.' Reply at 8–9), this Circuit has embraced the government's "mosaic" argument in the context of FOIA requests that implicate national security concerns. *See, e.g., Nat'l Security*, 331 F.3d at 928 (and cases cited therein). The Hardy declaration explains that, viewed as a piece of a "mosaic," disclosure of the withheld number would likely reveal a great deal about the FBI's investigative efforts under the Patriot Act:

> The significance of one piece of information may frequently depend on knowledge of many other items of information. Although the statistics to which plaintiffs seek access may appear, on their face, to be innocuous, their disclosure would be harmful to national security. This is because the information that has already been placed in the public domain (through statutorily required disclosures, media accounts, etc.), coupled with the classified information that has not been released, represent pieces of the mosaic which reveal a very significant and meaningful picture of the FBI's investigative efforts in the post-September 11, 2001 war on terror.

(Hardy Supp. Decl. ¶ 11.) As plaintiffs recognize, this approach may cast too wide a net, but both this Circuit and the Supreme Court have observed that "[w]hat may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context," and "bits and pieces" of data " 'may aid in piecing together bits of other

---

15. The Court acknowledges that not all of the declarant's explanations are of sufficient specificity or applicability. For example, the fact that publicizing the statistic would "disclose the very fact that the FBI is engaged in certain investigations which contemplate the use of this particular FISA technique," as plaintiffs argue, does not identify any harm that would derive from the release of the statistic, and the government's concern regarding the disclosure of field-office specific data is irrelevant, as plaintiffs do not seek that information. (*See* Pls.' Reply at 5–6 (quoting Supp. Hardy Decl. ¶ 8).)

information even when the individual piece is not of obvious importance in itself.'" *Nat'l Security,* 331 F.3d at 928 (quoting *Sims,* 471 U.S. at 178, 105 S.Ct. 1881).[16]

## CONCLUSION

This Circuit's law constrains the Court to conclude that the government's explanation is sufficiently detailed and persuasive to justify the continued withholding under Exemption 1 of the number of section 215 applications submitted by FBI field offices. Accordingly, defendant's motion and plaintiffs' cross-motion will be granted in part and denied in part. Plaintiffs are entitled to expedited processing of their request for all records relating to section 215, but the specific statistic they seek has been properly withheld under Exemption 1. A separate Order accompanies this Memorandum Opinion.

## ORDER

For the reasons given in the accompanying Memorandum Opinion, it is hereby **ORDERED** that Defendant's Motion for Partial Summary Judgment is **GRANTED IN PART and DENIED IN PART** and Plaintiffs' Cross-motion for Partial Summary Judgment is **GRANTED IN PART and DENIED IN PART;** it is

**FURTHER ORDERED** that defendant has properly withheld information contained in the document entitled "Business Record Order Requests since 10/26/2001"; it is

**FURTHER ORDERED** that defendant shall process plaintiffs' request for all rec-

ords relating to section 215 consistent with 5 U.S.C. § 552(a)(6)(E)(iii) and 28 C.F.R. § 16.5(d)(4) ("as soon as practicable"); and it is

**FURTHER ORDERED** that a status hearing is set for May 20, 2004, at 3:30 p.m., in order to establish dates for the defendant's production of responsive documents.

**SO ORDERED.**

---

**16.** The Hardy declaration also details concerns about the FBI's ability to protect other sets of statistics from disclosure if plaintiffs were to succeed here. (Supp. Hardy Decl. ¶ 11.) He describes that "if these kinds of classified statistics were coupled with the number of FISAs which have been authorized ... and the number of cases opened/closed per year, a database could be built with rela-

tive ease which would reveal a detailed road map of how the FBI conducts its investigations ... [and] sheer demographics would reveal the geographical concentration of these investigative activities, which in turn would reveal the full extent of the nature and scope of the FBI's counterterrorism and counterintelligence activities." (*Id.* ¶ 9.)